## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

|                                                        |     |                          |
| ------------------------------------------------------ | --- | ------------------------ |
| RICHARD ANTHONY,                                       | )   |                          |
|                                                        | )   |                          |
| Plaintiff,                                             | )   |                          |
|                                                        | )   |                          |
| -vs-                                                   | )   | Case No. CIV-21-533-F    |
|                                                        | )   |                          |
| CITY OF OKLAHOMA CITY,                                 | )   |                          |
| OKLAHOMA, a political subdivision                      | )   |                          |
| of the State of Oklahoma, et al.,                      | )   |                          |
|                                                        | )   |                          |
| Defendants.                                            | )   |                          |

## <u>ORDER</u>

Defendants City of Oklahoma City and Caleb Gottschalk move for summary judgment under Rule 56(a), Fed. R. Civ. P., as to the pending 42 U.S.C. § 1983 and Oklahoma state law claims against them. *See*, doc. nos. 77 and 82. Plaintiff Richard Anthony responded, objecting to the requested relief as to certain of those claims. *See*, doc. nos. 92 and 93. Defendants have replied. *See*, doc. nos. 94 and 95. Upon review of the parties' submissions, the court makes its determination.

### Background[1]

1. ### <u>The Incident</u>

On August 2, 2019, at approximately 10:48 p.m., a resident, who resided on the second floor of an Oklahoma City apartment building, called 911 and reported a man was pounding on a door trying to break into a first-floor apartment. The caller described the man as white and wearing "Dockers." *See*, doc. no. 82-1. He stated

---

[1] For summary judgment purposes, the facts are construed in favor of Anthony, as the non-moving party. *See*, <u>Arnold v. City of Olathe, Kansas</u>, 35 F.4th 778, 785 n.1 (10th Cir. 2022).

that the man was trying to kick down the door to the apartment.  The caller stated that he was yelling, "let me in, let me in."  *Id*.  He also indicated that the man may be the actual tenant, but he did not know.  *Id*.  The fact that the individual may be an actual tenant was not conveyed by dispatch.  *See*, doc. no. 82-2.

Defendant Caleb Gottschalk (Gottschalk), a sergeant with the Oklahoma City Police Department, was dispatched to respond to the call, which was classified as a priority one call (danger to life or property) for first degree burglary.  Gottschalk arrived without using his vehicle's lights or sirens.  He parked away from the subject apartment building and approached it on foot.  He walked past vehicles parked under a carport.  The carport was lighted, but the outside of the apartment complex was not.  Gottschalk was in uniform and wore a body camera.  As Gottschalk approached the subject apartment building, he shined his flashlight toward the building.  A private security guard in uniform, later identified as Randy Rigsby, yelled, "hey, officer."  *See*, doc. no. 82-4.  Gottschalk walked under the lighted carport toward the building.  He observed and shined his flashlight on a white male, in khaki cargo pants, who was later identified as plaintiff Richard Anthony (Anthony).  Anthony was standing on a sidewalk in front of a lighted breezeway of the apartment building.  Gottschalk observed Mr. Rigsby, as well as a female, later identified as Lisa Davis (Davis).  Mr. Rigsby stated to Gottschalk, "hey, he's trying to kick in doors," referring to Anthony.  *Id*.  Gottschalk approached closer with his flashlight shining directly on Anthony, who was holding a cellular telephone to his right ear and had his left hand in the pocket of his pants.  Without identifying himself as a police officer, Gottschalk yelled to Anthony, "what are you doing, take your hand of your pocket."  *Id*.  As he approached closer, he asked for Anthony to take his hand out of his pocket, and Anthony replied "no."  *Id*.  Gottschalk ordered Anthony again to take his hand out of his pocket, and then stated to Anthony, "I said take your hand out of your pocket."  *Id*.  Anthony replied, "I said no."  *Id*.  Anthony testified at his

deposition that he thought the security guard, rather than a police officer, was ordering him to show his hand because Gottschalk had not identified himself and had shined the flashlight in his face and he did not see a police car or flashing lights.

After Anthony replied, "I said no," Gottschalk sprayed Anthony's face with oleoresin capsicum (OC) spray, also known as pepper spray.  Doc. no. 82-4. Anthony bent over and put his cellular telephone in his right pocket.  Anthony still had his left hand in his left pocket.  Gottschalk told Anthony several more times to take his hand out of his pocket.  Anthony said, "I haven't done anything." *Id*.  Other OCPD officers arrived at the scene.  Gottschalk told Anthony twice to put his hands behind his back and another OCPD officer told Anthony to do as Gottschalk instructed.  Gottschalk grabbed Anthony's hands and handcuffed him.  Anthony continued to say that he hadn't done anything.  Gottschalk told Anthony he "wasn't following instructions" and he "was kicking doors." *Id*. After he was handcuffed, Anthony raised to a standing position but with his head down.  Gottschalk, who remained behind Anthony, began searching him. Anthony continued to say that he hadn't done anything.  Davis asked Anthony if he wanted her to try to "wake her up," and Anthony replied "yeah." *Id*.  Subsequently, Anthony told Gottschalk there were "absolutely no charges." *Id*.  Gottschalk said to Anthony that he was "not following instructions" and "that's resisting." *Id*.  Anthony claimed that he was not resisting; he was at his own residence.  Gottschalk told him that could have been figured out if Anthony had taken his hand out of his pocket, but he didn't want to do that.  Anthony told Gottschalk, "I had no idea who you are." *Id*.  Gottschalk asked, "did you see the police department?" *Id*.  Anthony stated, "no, man . . . police, you ain't police." *Id*. Gottschalk questioned, "I'm not?" and stated, "I'm wearing an Oklahoma City police uniform." *Id*.  Anthony said, "I can't see that." *Id*.  Gottschalk said, "you could, when I walked up." *Id*.  Anthony was still standing with his head down and his eyes were closed.  Turning his face to his right toward Gottschalk,

Anthony said, "hey, how about this, call Lieutenant Roof." *Id*. Gottschalk, who was searching Anthony's right pant pocket, said, "he's going to tell you the same thing I am doing right now, I know Roof." *Id*. Anthony then stated that "I can tell you this, Mike Roof will tell you to back the fuck off." *Id*.[2] Gottschalk immediately grabbed Anthony by the shirt and arm, turning him while stating "don't freaking turn on me, don't turn on me" and, according to Anthony, then slammed Anthony against the brick wall. *Id*.; *see also*, doc. no. 92-2, ECF p. 13, ll, 22-23; ECF p. 15, ll. 1-2. According to Anthony, Gottschalk then either put his feet behind or in front of him, tripping Anthony or putting him down some way with his legs, and then Gottschalk fell on top of him. *See*, doc. no. 92-2, ECF p. 18, ll. 17-24; ECF p. 15, ll. 15-18. During the incident, Anthony's head struck the wall and his face had hit the "pointy part of the brick." *Id*., ECF p. 15, ll. 24-25. After the incident, Gottschalk continued to search Anthony. Gottschalk told Anthony that he was publicly intoxicated. Anthony replied that he was not; he was at his home. Gottschalk told Anthony he was going to jail. Anthony said, "I ain't done shit." *See*, doc. no. 82-4. Gottschalk told him he was resisting and was publicly intoxicated. Anthony said, "I've not done shit." *Id*. Gottschalk told Anthony to stand up, and he continued to search him. Subsequently, Anthony said he was bleeding. Gottschalk acknowledged his face was bleeding and requested that EMSA be called. While searching Anthony, Gottschalk found a box knife in one of his pant pockets.[3] Anthony testified at his deposition that he used the knife to open boxes at work.

When EMSA arrived, Anthony did not want to take the ambulance. As a result, he was transported to the hospital emergency room by Gottschalk.

---

[2] At the time Anthony is making this statement, Gottschalk's body camera only shows Anthony's shirt.

[3] Anthony's pants had seven pockets. Doc.no. 92-2, ECF p. 16, ll. 19-20; 22.

A physical exam showed Anthony was oriented but smelled strongly of alcohol.  Anthony's ethanol level was 305.13mg/dL (31% w/v).  A CT scan was performed on his head, which showed no acute intracranial abnormalities.  After the doctor determined Anthony was stable, he was discharged.  Although the medical records stated that the discharge destination was "Jail," they also stated Anthony was discharged "to home," with instructions to return to the hospital "for any new, persistent, or worsening of symptoms (specifically any headache, nausea/vomiting, or altered level of consciousness)" and to be awakened "from sleep every 2 hours for the next 24 hours to check for appropriate mentation."  Doc. no. 83-1; ECF pp. 4, 7, and 11.  Gottschalk transported Anthony to the Oklahoma County jail for booking.  According to Anthony, he was not awakened every 2 hours as instructed.

Anthony received follow-up diagnostic testing on August 12, 2019.  The results were normal and showed no defined soft tissue swelling.  Two weeks after the incident, Anthony became ill, specifically, vomiting, and having slurred speech, while on vacation in Las Vegas.  He sought medical treatment after he returned to Oklahoma City.  The doctor performed a neurological exam, which was normal, and his speech was found to be normal.

2. Training and Investigation

Gottschalk was employed by the City as a police recruit on May 25, 2012.  Upon employment, Gottschalk received over six months of training from the OCPD Training Academy.  During the training academy, Gottschalk received training in the use of force in effecting an arrest or detention.  After attending the training academy, Gottschalk received approximately four months of additional training with a field training officer.  In addition, Oklahoma law requires full-time police officers to complete 25 hours of continuing law enforcement training every year.  Prior to the subject incident, Gottschalk had attended 578 hours of in-service training.

The OCPD has a police operations manual which includes its current policies, procedures, and rules. Gottschalk was issued a digital copy of the manual and directed to be familiar with its contents and any updates. In addition to other policies, the manual contained a use of force policy. That policy provided in part that officers may use only the amount of force that is reasonably necessary to "[e]ffect a lawful arrest[;]" "[p]revent the escape of a person lawfully arrested[;]" "[a]pprehend a person who has escaped from lawful arrest[;]" and "[p]rotect themselves or others from danger of death or bodily harm." Doc. no. 77-23, ECF p. 3. In addition, the manual contained a procedure, which stated that "[a]ll officers will be trained in the use of OC Spray." Doc. no. 93-4, ECF p. 1. The procedure stated that "OC Spray is considered a use of force and shall be deployed in a manner consistent with the [OCPD's] written directives, Use of Force Options Matrix and training guidelines." *Id*. It further stated that "OC Spray may be used on a person who is passively resisting, actively resists in a defense manner, is aggressively offensive without a weapon, likely to harm others, or places life or limb in jeopardy and when all other reasonable means to accomplish the desired action have been exhausted or would likely be ineffective under the circumstances." *Id*. Another OCPD procedure defined a "passive resistor" as an "uncooperative subject who is not controlled by the officer's verbal direction but who does not resist an officer in any physical way." *Id*., ECF p. 2.

In accordance with an OCPD procedure, an OCPD lieutenant investigated Gottschalk's use of force on Anthony and issued a use of force report. The use of force report included interview statements from Anthony, Mr. Rigsby and Ms. Davis. The report attached documents, photographs, and footage from Gottschalk and other officers' body cameras. Only Gottschalk's body camera showed the use of force. After review, the lieutenant concluded that he had no issue with the use of force. The report was forwarded to a captain and then a major in the OCPD who

likewise had no issues with the use of force. The Use of Force Screening Committee, comprised of three majors with OCPD, determined the use of force by Gottschalk was justified and that application of the force was appropriate.

3. <u>Procedural History</u>

Anthony filed this action against Gottschalk and the City seeking monetary relief under 42 U.S.C. § 1983 and Oklahoma state law.[4]  In an amended complaint, Anthony alleged Gottschalk subjected him to the use of excessive force in violation of the Fourth and Fourteenth Amendments.  Additionally, Anthony alleged that Gottschalk acted with deliberate indifference to Anthony's serious medical needs and health and safety in violation of the Eighth Amendment.  Anthony claimed Gottschalk was liable under § 1983 in both his individual and official capacities. Anthony also claimed that the City was liable under § 1983 because his injuries were directly caused by municipal customs and practices.

In addition to the § 1983 claims, Anthony alleged state law claims against Gottschalk and the City for negligence, assault, battery, wrongful arrest, and intentional infliction of emotional distress.

Upon motion by Gottschalk pursuant to Rule 12(b)(6), Fed. R. Civ. P., the court dismissed Anthony's state law claims against Gottschalk, in his individual capacity, for assault, battery, and wrongful arrest (the fifth, sixth and seventh claims for relief).  *See*, Order, doc. no. 27.  It also dismissed all claims alleged against Gottschalk in his official capacity, and any claim arguably alleged against him under

---

[4] The action was originally filed in the District of Oklahoma County, State of Oklahoma.  The City removed the action to this court on the basis of the existence of original jurisdiction under 28 U.S.C. §§ 1331 and 1343.  *See*, doc. no. 1.  In addition to claims alleged against Gottschalk and the City, Anthony alleged state law claims against Randy Rigsby, the security guard, and Rigsby's employer.  *Id*.  The claims against Rigsby and his employer were later dismissed pursuant to a joint stipulation of dismissal with prejudice, *see*, doc. no. 65, leaving Gottschalk and the City as the remaining defendants.

the Oklahoma Constitution.[5]   Further, the court deemed the § 1983 deliberate indifference to medical needs claim to be brought under the Fourteenth Amendment, rather than the Eighth Amendment.  *Id.*

Gottschalk now moves for summary judgment, asserting the defense of qualified immunity as to both § 1983 claims.[6]  He also challenges the remaining state law claims against him—negligence and intentional infliction of emotional distress. In addition, the City moves for summary judgment, arguing that Anthony cannot establish municipal liability under § 1983 and cannot establish liability under the Oklahoma Governmental Tort Claims Act (GTCA), 51 O.S. § 151, *et seq.*, for the state law claims—negligence, assault, battery, wrongful arrest, and intentional infliction of emotional distress.

<u>Legal Standard</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  "A disputed fact is material if it might affect the outcome of the suit under the governing law[.]"  <u>Palacios v. Fortuna</u>, 61 F.4th 1248, 1256 (10th Cir. 2023) (quotation marks and citation omitted).  On summary judgment, the court construes the facts in the light most favorable to the nonmovant and draws all reasonable inferences in his favor.  *Id*.  In qualified immunity cases, this generally means adopting the plaintiff's version of the facts, unless the facts are contradicted by objective evidence, such as video surveillance footage.  *Id*.

---

[5] The court also dismissed any claim arguably alleged against the City under the Oklahoma Constitution.

[6] "'Persons sued under § 1983 in their individual capacity may invoke the defense of qualified immunity.'"  <u>Wilkins v. City of Tulsa, Oklahoma</u>, 33 F.4th 1265, 1272 (10th Cir. 2022) (quoting <u>Duda v. Elder</u>, 7 F.4th 899, 909 (10th Cir. 2021)).  "Qualified immunity 'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.'  *Id*. (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)).

As stated, Gottschalk moves for summary judgment asserting the defense of qualified immunity as to Anthony's § 1983 claims.  "When a defendant asserts qualified immunity in a summary judgment motion, the plaintiff must show that (1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation."  Wilkins, 33 F.4th at 1272.

"'A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Wilkins, 33 F.4th at 1272 (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)).  "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." Id. (quotation marks and citation omitted). "'[A] case directly on point' is not necessary if 'existing precedent [has] placed the statutory or constitutional question beyond debate.'"  Id. (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).

<u>Unaddressed Claims</u>

Anthony, in response to Gottschalk's motion, does not address the § 1983 claim for deliberate indifference to serious medical needs or the state law negligence and intentional infliction of emotional distress claims.  In its discretion, the court deems Gottschalk's motion as to the unaddressed claims confessed pursuant to LCvR7.1(g).  Upon independent review of the motion as to the unaddressed claims, the court concludes that Anthony has failed to demonstrate a violation of a clearly established right and Gottschalk is therefore entitled to qualified immunity on the § 1983 claim for deliberate indifference to serious medical needs.  The court also concludes that Gottschalk has sufficiently demonstrated that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law on the state law claims for negligence and intentional infliction of emotional distress.

Anthony, in response to the City's motion, does not address municipal liability under § 1983 for deliberate indifference to serious medical needs or liability under the GTCA for the state law claims for assault, battery, wrongful arrest, and intentional infliction of emotional distress. The court deems the City's motion as to the unaddressed claims confessed pursuant to LCvR7.1(g). Upon independent review of the motion as to the unaddressed claims, the court concludes that the City has sufficiently demonstrated that there are no genuine issues of material fact and that it is entitled to summary judgment as a matter of law on the municipal liability claim under § 1983 for deliberate indifference to serious medical needs and on the claims under the GTCA for assault, battery, wrongful arrest, and intentional infliction of emotional distress.

With the above rulings, the remaining claim against Gottschalk is the § 1983 excessive use of force claim. The remaining claims against the City are municipal liability under § 1983 for excessive use of force and liability under the GTCA for negligence.

Discussion

1. <u>Qualified Immunity</u>

   a. *Constitutional Violation*

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989) (emphasis omitted). <u>Palacios</u>, 61 F.4th at 1256 (quotation marks and citation omitted). Under this standard, the court asks whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id*. (quotation marks omitted). The court must judge an officer's use of force "from the perspective of a reasonable officer on the

10

scene, rather than with the 20/20 vision of hindsight" and this "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 396-397.  "Ultimately, 'the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'"  Pauly v. White, 874 F.3d 1197, 1215 (10th Cir. 2017) (quoting Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)).

To assist in assessing whether the use of force is objectively reasonable, Tenth Circuit precedent considers three nonexclusive factors identified by the Supreme Court in Graham v. Connor.  These factors, referred to as the Graham factors, are "the severity of the crime at issue;" "whether the suspect poses an immediate threat to the safety of the officers or others:" and "whether he is actively resisting arrest or attempting to evade arrest by flight."  Wilkins, 33 F.4th at 1273 (quoting Graham, 490 U.S. at 396).  The second factor—whether the suspect poses an immediate threat to the safety of the officers or others—is "'undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force.'"  Wilkins, 33 F.4th at 1273 (quoting Pauly, 874 F.3d at 1215).

i.  Pepper Spray

Anthony argues that Gottschalk used excessive force when he sprayed him with OC spray, which the court now refers to as pepper spray.  Applying the Graham factors and considering the totality of the circumstances, the court concludes that a reasonable jury could not find that Gottschalk's use of pepper spray was objectively unreasonable.

Graham Factors

*Severity of the Crime*

The first Graham factor inquires as to the "severity of the crime at issue[.]" Graham, 490 U.S. at 396. Under Tenth Circuit precedent, "[w]hen the crime at issue is a felony, regardless of whether the felony is violent or nonviolent, the crime is considered to have a high degree of severity which weighs against the plaintiff." Palicios, 61 F.4ᵗʰ at 1256. Here, Gottschalk responded to a call classified as first-degree burglary, which is a felony under Oklahoma law. *See*, 21 O.S. § 1436(1). When he arrived at the scene, Gottschalk observed Anthony standing on the sidewalk. However, upon approach, he was informed by Rigsby, the security guard, that Anthony was "trying to kick *in* doors." *See*, doc. no. 82-4 (emphasis added). Attempted first-degree burglary is also felony under Oklahoma law. *See*, 21 O.S. § 42(1); 21 O.S. § 1436(1). The same is true for attempted second-degree burglary. *See*, 21 O.S. § 42(1); 21 O.S. § 1435(A); 21 O.S. § 1436(2). The court concludes that the first Graham factor weighs against Anthony as to a finding that the use of the pepper spray was objectively unreasonable.[7]

*Actively Resisting or Attempting to Evade Arrest by Flight*

Turning to the third Graham factor, whether Anthony actively resisted or attempted to evade arrest, the court concludes that the factor slightly weighs in favor of Anthony with respect to the use of pepper spray. Gottschalk's body camera footage shows that he ordered Anthony to take his hand out of his pocket four times. Anthony said "no" on the second time, and on the fourth time, he responded, "I said no." Doc. no. 82-4. The Tenth Circuit has concluded that the failure to immediately obey an officer's orders is not considered actively resisting arrest. *See*, Jordan v.

---

[7] In so concluding, the court rejects Anthony's argument that he was "suspected of committing a nonviolent misdemeanor" and "[a]t worst . . . could be accused of some sort of property crime for allegedly kicking a door." Doc. no. 92, ECF p. 17 and n. 1.

Jenkins, ___ F.4th ___, 2023 WL 4567769, *7 (10th Cir. July 18, 2023).   Although the plaintiff in Jordan only disobeyed one instruction, rather than four instructions, like Anthony, the court notes that the four instructions were given to Anthony in quick succession.   As intoxicated persons sometimes do, Anthony only verbally resisted Gottschalk's commands; he did not attempt to resist them in any physical way.   And according to the OCPD's police manual and Gottschalk's deposition testimony, the resistance exhibited by Anthony was passive, rather than active.   *See*, doc. no. 93-4, ECF p. 2; doc. no. 82-5, ECF p. 12, ll. 11-15.   Further, there is no evidence that Anthony was attempting to evade arrest when Gottschalk deployed the pepper spray.

*Immediacy of the Threat*

The second Graham factor is the "most important" and requires the court to look at "whether the officers or others were in danger at the precise moment that they used force."   Wilkins, 33 F.4th at 1273 (quotation marks and citations omitted). The court concludes that the second factor weighs in favor of Gottschalk, supporting a finding that the use of pepper spray was not objectively unreasonable.   Prior to Gottschalk deploying the pepper spray, Gottschalk had ordered Anthony to take his hand out of his pocket four times and Anthony had refused.   And in response to the last instruction, Anthony stated, "I said no."  Doc. no. 82-4.   Anthony's obstinate refusal to comply would have indicated to a reasonable officer, in Gottschalk's position, that Anthony might be armed and dangerous.   *See*, United States v. Harris, 313 F.3d 1228, 1236 (10th Cir. 2002) (officer reasonably justified in believing that defendant might be armed and dangerous when he refused to comply with request to take his hands out of his pockets).   Gottschalk testified that everyone's safety was "his first objective."  Doc. no. 82-5, ECF p. 11, ll. 7-9.   Gottschalk as well as Rigsby and Davis were in close proximity to Anthony when Gottschalk gave the final command.   And Gottschalk, who was closest to Anthony, was without any cover.

When Anthony replied, "I said no," Gottschalk could reasonably perceive from Anthony's hostile tone of voice that he had negative intentions toward him. The court finds that, even viewing the facts in a light most favorable to Anthony, a reasonable officer, in Gottschalk's position, would reasonably perceive Anthony as a potential threat to his and others' safety, at the precise moment that Gottschalk used the pepper spray.

In briefing, Anthony argues that he was not disobeying lawful orders because he was unaware of police presence. Anthony points out that Gottschalk did not identify himself as a police officer. And according to Anthony, he believed the security guard was instructing him to take his hand out of his pocket. However, under Tenth Circuit precedent, a police officer does not have to identify himself in every situation. Palacios, 61 F.4th at 1258. The evidence, viewed in Anthony's favor, establishes that a reasonable officer, in Gottschalk's position, could conclude that Anthony knew that Gottschalk was a police officer. *Id*. at 1257 ("A suspect's subjective knowledge of whether he is encountering police is not relevant to the inquiry, but rather the question is whether an objectively reasonab[e] officer could conclude, based on the facts and circumstances surrounding the situation, that the suspect knew that he was being pursued by the police.") (quotation marks and citation omitted; alteration in original). Although it was late at night and Gottschalk shined a flashlight directly at Anthony, Rigsby had yelled out, "hey officer," doc. no. 82-4, as Gottschalk approached, and as Gottschalk came closer, he stated, "hey, he is trying to kick in doors." *Id*. Gottschalk was in full uniform, with his badge, gun, and baton, and as he approached, he walked under a carport which was lighted. Gottschalk gave instructions to Anthony that were consistent with law enforcement instructions. *See*, Palacios, 61 F.4th at 1258 (showing hands instruction consistent with law enforcement instruction). Further, when he gave his final instruction to

Anthony to take out his hand out of his pocket, Gottschalk was within a short distance of Anthony.

In sum, the first and second <u>Graham</u> factors weigh in favor of Gottschalk's use of pepper spray.  Considering the totality of circumstances, viewed in Anthony's favor, the court concludes a reasonable jury could not conclude that the use of pepper spray was objectively unreasonable.  At the time Gottschalk deployed the pepper spray, Anthony had been suspected of committing a felony, was not complying with verbal commands, and was reasonably perceived as a potential threat to the safety of Gottschalk as well as Rigsby and Davis by refusing to take his hand out of his pocket.  Therefore, the court concludes that Anthony has failed to demonstrate that Gottschalk violated his Fourth Amendment rights by spraying him with pepper spray.

       ii.   <u>Takedown Maneuver</u>

Anthony additionally argues that Gottschalk used excessive force when he performed a takedown maneuver while Anthony was handcuffed.  Although Gottschalk disputes that he performed a takedown maneuver on Anthony, the court concludes that viewing the evidence in Anthony's favor, a reasonable jury could conclude that Gottschalk performed a takedown maneuver.  The court also concludes that applying the <u>Graham</u> factors and considering the totality of the circumstances, a reasonable jury could conclude that the takedown maneuver was objectively unreasonable.

     <u>Graham Factors</u>

     *Severity of the Crime*

Shortly before Gottschalk performed the takedown maneuver, Anthony told Gottschalk he hadn't done anything and that he was at his own residence.  Davis also asked Anthony if he wanted her to "try to wake her up," and he said "yeah."  Doc. no. 82-4.  Subsequently, Anthony complained to Gottschalk that there were

absolutely no charges, and Gottschalk specifically told Anthony that he was not following instructions and "that's resisting." Doc. no. 82-4. One of the charges for which Anthony was arrested was interfering with official process – resisting an arrest, a misdemeanor. Doc. no. 82-3. The Tenth Circuit has stated that "'a minor offense supports only the use of minimal force.'" Jordan, 2023 WL 4567769, at *7 (quoting Wilkins, 33 F.4th at 1273). Thus, the first Graham factor weighs against the use of anything more than minimal force and favors Anthony on the issue of whether the use of the takedown maneuver was objectively unreasonable. Wilkins, 33 F.4th at 1274.

*Actively Resisting or Attempting to Evade Arrest by Flight*

The court concludes that the third Graham factor also weighs in favor of Anthony in finding the takedown maneuver was objectively unreasonable. In Dixon v. Richer, 922 F.2d 1456, 1462 (10th Cir. 1991), the Tenth Circuit ruled that a police officer's aggressive frisk of a plaintiff did not constitute excessive force because the plaintiff's "turning around and swearing" at the officer could reasonably be interpreted as "an act of resistance." However, the court concludes (again viewing the evidence in Anthony's favor) that a reasonable jury could conclude that Anthony, while swearing at Gottschalk, was not turning around shortly before Gottschalk performed the takedown maneuver. A reasonable jury could conclude that Anthony, even though swearing at Gottschalk, was not engaging in physically aggressive behavior toward Gottschalk. Thus, a reasonable jury could conclude that Anthony was not actively resisting arrest. Further, there is no evidence that Anthony was attempting to evade arrest by flight.

*Immediacy of the Threat*

Although Gottschalk suggested in deposition that Anthony posed a threat because he could have tried to bite him, spit on him or headbutt him, the court concludes that a reasonable jury could find that Anthony did not pose a threat when

16

Gottschalk performed the takedown maneuver, given that his hands were handcuffed behind his back, he was under Gottschalk's control, and other officers were nearby. The court therefore concludes the second <u>Graham</u> factor also favors Anthony in finding the takedown maneuver was objectively unreasonable.

In sum, the three <u>Graham</u> factors favor Anthony, and considering the totality of the circumstances, the court concludes that a reasonable jury could conclude the takedown maneuver was objectively unreasonable. The court concludes that a reasonable jury could conclude that Gottschalk violated Anthony's Fourth Amendment rights by performing the takedown maneuver.

      b. *Clearly Established Law*

Having found that the evidence, viewed in Anthony's favor, demonstrates a Fourth Amendment violation with respect to the takedown maneuver, the court must decide if Anthony has shown that Gottschalk's conduct violated clearly established law. "'To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.'" <u>Wise v. Caffey</u>, 72 F.4th 1199, 1208 (10th Cir. 2023) (quoting <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 589 (2018)). However, "'[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id*. (quoting <u>City of Tahlequah v. Bond</u>, 142 S. Ct. 9, 11 (2021). This is "especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." <u>Bond</u>, 142 S. Ct. at 11-12 (quotation marks and citation omitted). "[T]he salient question is whether the state of the law gave the defendant[] fair warning that [his] alleged treatment of the plaintiff[] was unconstitutional." <u>Wise</u>, 72 F.4th at 1209 (quotation marks and citations omitted). "The law was clearly established if it was sufficiently clear that every reasonable

official would understand that what he is doing is unlawful." *Id*. (quotation marks and citations omitted).

The Tenth Circuit in Jordan v. Jenkins, *supra*., concluded that its decision in Morris v. Noe, 672 F.3d 1185, 1190 (10th Cir. 2012), establishes that "a takedown maneuver is unconstitutional when the arrestee poses no threat, puts up no resistance, and does not attempt to flee." *Id*., 2023 WL 4567769, at *8. Taking the facts in the light most favorable to Anthony, a reasonable jury could conclude that he posed no threat, put up no resistance, and did not attempt to flee. Consequently, it was clearly established in August of 2019 that the takedown maneuver utilized by Gottschalk was excessive and in violation of the Fourth Amendment.

The court therefore concludes that Gottschalk is not entitled to summary judgment based on the defense of qualified immunity with respect the § 1983 claim for use of excessive force based upon the takedown maneuver. Gottschalk's motion will therefore be denied with respect to the § 1983 excessive use of force claim based on the takedown maneuver.

As to Gottschalk's use of pepper spray, the court has previously concluded that the use of pepper spray on Anthony was not objectively unreasonable and therefore did not violate Anthony's Fourth Amendment rights. But, aside from the merits of that conclusion, the court also concludes that Anthony has failed to establish that Gottschalk violated Anthony's clearly established constitutional rights. In his briefing, Anthony cites two cases involving pepper spray, Wilkins v. City of Tulsa, *supra.*, and Martinez v. New Mexico Dept. of Public Safety, 47 Fed. Appx. 513 (10th Cir. 2002). Although the latter case is unpublished, it "need not be ignored in determining whether the law was clearly established[.]" McCoy v. Meyers, 887 F.3d 1034, 1049 n. 16 (10th Cir. 2018) (quotation marks and citations omitted). Nonetheless, the court concludes that neither case gives fair warning that Gottschalk's conduct was unconstitutional. In both cases, mace or pepper spray was

used after the plaintiff was handcuffed and posed no threat to the officer.  Further, at the time of the use of force, the plaintiff was suspected of a misdemeanor offense.

The other cases cited by Anthony do not involve materially similar conduct to that present in this case, and also do not, in the court's view, apply with obvious clarity to the conduct at issue.  *See*, Irizarry v. Yehia, 38 F.4th 1282, 1294 (10th Cir. 2022) ("To determine whether the law is clearly established, the relevant precedent is considered on point if it involves *materially similar conduct* or applies with *obvious clarity* to the conduct at issue.") (quotation marks and citation omitted; emphasis in original).  Consequently, the court concludes that Anthony has failed to demonstrate that his right to be free from excessive force in the form of pepper spraying was clearly established when this encounter unfolded in August of 2019. The court therefore concludes that Gottschalk is entitled to summary judgment based on the defense of qualified immunity with respect to the § 1983 excessive use of force claim based on the use of pepper spray.  Gottschalk's motion will be granted with respect to the § 1983 excessive use of force claim based on the use of pepper spray.

2. Municipal Liability

"A § 1983 suit against a municipality for actions of its police officer[] requires proof that (1) an officer committed a constitutional violation and (2) a municipal policy was the moving force behind the constitutional deprivation that occurred." Estate of Larsen v. Murr, 511 F.3d 1255, 1264 (10th Cir. 2008).  Here, the court has found that Gottschalk did not commit a constitutional violation with respect to the use of pepper spray, but he did commit a constitutional violation with respect to the takedown maneuver.  Therefore, the court addresses whether the City may be held liable for Anthony's alleged injuries resulting from the takedown maneuver.

Although Anthony claims that Gottschalk inflicted injury on him with use of the takedown maneuver, the City may not be held liable under § 1983 solely because

of the inflicted injury by its employee.  Bryson v. City of Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010).  Rather, to hold the City liable for the actions of its employee, Anthony must show that the municipality had a policy or custom that caused his injury.  Id.  A municipal policy or custom may take the form of a formal regulation or policy; a widespread, permanent, and well-settled custom; a decision by an employee with final policymaking authority; a final policymaker's ratification of both an employee's unconstitutional actions and the basis for them; or the deliberately indifferent failure to adequately train or supervise employees.  Id.  Here, Anthony's municipal liability claim with respect to the takedown maneuver appears to be based upon failure to adequately train Gottschalk and ratification of Gottschalk's conduct.  Doc. no. 93, ECF p. 11.

"'[T]o establish a municipality's liability for inadequate training on the use of force, a plaintiff must meet a four part test:'

> A plaintiff must show (1) the officer[] exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city towards persons with whom the police officers come into contact[;] and (4) there is a direct causal link between the constitutional deprivation and the inadequate training."

Huff v. Reeves, 996 F.3d 1082, 1092 (10th Cir. 2021) (quoting Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998)).

Anthony asserts that the City "[failed] to properly train OCPD officers with respect to the use of force on suspects or detainees who are unarmed or otherwise pose no threat of harm."  Doc. no. 93, ECF p. 11.[8]  However, it is undisputed by

---

[8] The court notes that while Anthony argues he was unarmed, Gottschalk found a box knife in one of his pant pockets.

Anthony that OCPD officers, including Gottschalk, were trained on the proper use of force.  Officers were trained to use only the amount of force that is reasonably necessary to "[e]ffect a lawful arrest[;]" "[p]revent the escape of a person lawfully arrested[;]" "[a]pprehend a person who has escaped from lawful arrest[;]" and "[p]rotect themselves or others from danger of death or bodily harm."  Doc. no. 77-23, ECF p. 3.  In his papers, Anthony has failed to identify what additional training by the City would have caused Gottschalk not to utilize the takedown maneuver.  The Tenth Circuit has "repeatedly held that conclusory or generalized failure-to-train allegations are insufficient."  Huff, 996 F.3d at 1093.  A plaintiff must identify a specific deficiency in the entity's training program, closely related to his ultimate injury.  Anthony has not pointed to any training by the OCPD that would have prevented his alleged constitutional violation.  Because there is no "direct causal link between the [alleged] constitutional deprivation and the [alleged] inadequate training," Huff, 996 F.3d at 1093, Anthony's failure to adequately train claim against the City fails.[9]

Anthony also argues that the City is liable under § 1983 because it ratified Gottschalk's unconstitutional conduct of using the takedown maneuver by determining that it was within policy.   However, assuming without deciding that the evidence, viewed in Anthony's favor, is sufficient to establish the City's ratification of Gottschalk's conduct of utilizing a takedown maneuver, the evidence is not sufficient for a reasonable jury to find that the alleged ratification caused the alleged constitutional violation.  As explained by the Tenth Circuit, ratification occurring *after* an alleged violation does not show that it caused the violation.  *See*, Cordova v. Aragon, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic princip[le]s of

---

[9] The court also finds that Anthony has failed to proffer sufficient evidence to show the alleged inadequate training amounted to deliberate indifference to the rights of persons with whom the police come into contact.

linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation.") (emphasis in original).    Here, the alleged ratification of Gottschalk's conduct occurred after the incident. Consequently, the City's alleged after-the-fact ratification of Gottschalk's alleged misconduct conduct is insufficient to establish a municipal liability claim against the City.  Anthony's ratification theory therefore fails.

Because Anthony has failed to establish a constitutional violation with respect to the use of pepper spray and has failed to establish that a municipal liability claim with respect to the takedown maneuver, the court concludes that the City is entitled to summary judgment on the § 1983 municipal liability claim.

3. Negligent Use of Excessive Force

In his complaint, Anthony has alleged a state law claim against the City for Gottschalk's negligent use of excessive force.  The City contends it cannot be held liable on that claim.  First, the City points out that, under the GTCA, a political subdivision, like a municipality, "shall be liable for loss resulting from . . . the torts of its employees acting within the scope of their employment *subject to the limitations and exceptions specified* in the" Act.    51 O.S. § 153 (emphasis added). The City asserts that one of the exceptions, otherwise known as exemptions, specified in the Act, is that a municipality "shall not be liable if a loss or claim results from . . . [a]ny claim which is limited or barred by any other law[.]"  51 O.S. § 155(16).  The City argues that under Oklahoma statutes, 21 O.S. § 643 and 21 O.S. § 1289.25(D), Gottschalk was specifically authorized to use force since he reasonably feared for his safety and others.  However, the court has previously found that a reasonable jury could conclude the takedown maneuver utilized by Gottschalk

was objectively unreasonable.  Consequently, the court rejects the City's argument that it is exempt from liability under § 155(16) based upon the two cited statutes.[10]

Next, the City argues that it cannot be held liable for the negligent use of excessive force claim because the actions of Anthony in attempting to break into an apartment, as initially reported, constituted a supervening act for which Gottschalk's negligence, if any, "is removed or wiped clean."  Doc. no. 77, ECF p. 34.  According to the City, Gottschalk's conduct merely furnished the condition that Anthony might suffer injury and that his actions were not the proximate cause of Anthony's injuries.  The City maintains that Anthony's injuries were the result of his own criminal acts.

In support of its argument, the City relies upon Felty v. City of Lawton, 578 P.2d 757 (Okla. 1977).  There, plaintiffs sued the City of Lawton and a Lawton police officer, alleging that the officer's negligence, while acting as an agent for the city, was the proximate cause of their daughter's death in an automobile accident.  The city and officer's liability was based upon the negligence of the officer in having left his marked police cruiser unattended with the keys in the ignition and with the motor running.  A thief stole the police car, driving it in a reckless and careless manner, causing injury and the daughter's ultimate death.  The question on appeal was whether the officer's negligence was the proximate cause of the daughter's injury.  The Oklahoma Supreme Court found it was not.  In so doing, it followed the holding in Merchants Delivery Service, Inc. v. Joe Esco Tire Co., 533 P.2d 601

---

[10] Further, the Oklahoma Supreme Court previously rejected a similar argument that a law which arguably creates an affirmative defense to liability by the agency's employee renders a municipality immune from suit based on § 155(16).  See, Morales v. City of Oklahoma ex rel. Oklahoma City Police Dept., 230 P.3d 869, 877-78 (Okla. 2010) ("A police officer's privilege to use reasonable force in making an arrest, sometimes conceptualized as providing a qualified immunity, should not be confused with an immunity that bars a suit ab initio.  The privilege merely provides a defense to liability, the availability of which to City is by virtue of § 155(16) commensurate with its availability to Officer McCoy.  City is clearly not entitled to judgment of exoneration based on § 155(16).").

(Okla. 1975), that "the proximate cause of an injury must be the efficient cause which sets in motion the chain of circumstances leading to the injury; if the negligence complained of merely furnishes a condition by which the injury was made possible and a subsequent independent act caused the injury, the existence of such condition is not the proximate cause of the injury." Felty, 578 P.2d at 760 (quotation marks omitted). The Oklahoma Supreme Court concluded that the officer's negligence merely furnished a condition by which the injury was made possible but did not constitute the proximate cause of the daughter's injury.

Here, the acts of Anthony in "trying to kick in doors" or "interfering with official process" were not a subsequent independent, unforeseeable act which caused Anthony's injury. Further, the facts, viewed in Anthony's favor, support a finding that Gottschalk utilized the takedown maneuver when Anthony did not pose a threat of harm to Gottschalk or others and was not actively resisting arrest or attempting to flee. As a result, Gottschalk's alleged negligence in using the takedown maneuver would be the proximate cause of Anthony's injuries rather than merely furnishing the condition by which the injury was made possible. Further, despite the City's argument that the City should not be responsible because Anthony had engaged in criminal acts, the Oklahoma Supreme Court in Morales allowed a negligence claim based on an officer's alleged use of excessive force to proceed even though the force occurred during the arrest of an individual. In sum, the court concludes that the City is not entitled as a matter of law to summary judgment on the negligence claim.[11]

---

[11] The City also challenges the negligent use of excessive force claim to the extent it is based on its alleged inadequate training of Gottschalk. However, it appears to the court from the allegations in the complaint that Anthony does not seek to hold the City independently liable for negligence based on inadequate training. The court thus need not address the City's argument.

Conclusion

For the reasons stated, the Motion for Summary Judgment of Defendant Caleb Gottschalk (doc. no. 82) is **GRANTED** with respect to (1) the § 1983 excessive use of force claim based upon the use of pepper spray; (2) the § 1983 claim for deliberate indifference to serious medical needs; (3) the state law claim for negligence; and (4) the state law claim for intentional infliction of emotional distress; and **DENIED** with respect to the § 1983 excessive use of force claim based upon the takedown maneuver.   Defendant City's Motion for Summary Judgment (doc. no. 77) is **GRANTED** with respect to the § 1983 municipal liability claims and the state law claims for assault, battery, wrongful arrest, and intentional infliction of emotional distress and **DENIED** with respect to the state law claim for negligence.

DATED this 14th day of August, 2023.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-0533p014.rev.docx

25